SOUTHWEST AIRLINES CO.,    )
                            )
        Plaintiff,        )
                            )      CIVIL ACTION NO.
VS.                     )
                            )      3:18-CV-0033-G
ROUNDPIPE, LLC, ET AL.,    )
                            )
        Defendants.    )

## MEMORANDUM OPINION AND ORDER

Before the court is the motion of the defendants Roundpipe, LLC ("Roundpipe"), Chase Roberts ("Roberts"), and Pavel Yurevich ("Yurevich") (collectively, "the defendants") to dismiss counts one and six of the plaintiff Southwest Airline Company ("Southwest")'s complaint pursuant to the Texas Citizens Participation Act ("TCPA") and to dismiss the entirety of Southwest's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Motion to Dismiss (docket entry 23). Also before the court is Southwest's request to dismiss the portions of the defendants' motion to dismiss brought under the TCPA. *See* Request to Dismiss Defendants' TCPA Ground and Request for Attorney's Fees ("Request to Dismiss") (docket entry 29). In this motion, Southwest also requests that the court grant Southwest the court costs and reasonable attorneys' fees it

incurred as a result of having to defend against the defendants' TCPA motion to dismiss. See *id.* For the reasons stated below, the defendants' motion to dismiss is denied and Southwest's request to dismiss and motion for attorneys' fees is also denied.

## I.  BACKGROUND

### A.  Factual Background

As noted above, the plaintiff in this suit is Southwest, a Texas corporation with its principal place of business in Dallas, Texas. Complaint (docket entry 1) at 2. Southwest offers and sells its goods and services under and in conjunction with a number of registered trademarks and service marks, including the following: (1) SOUTHWEST AIRLINES®, registration number 1,738,670; (2) SOUTHWEST®, registration number 3,129,737; (3) SOUTHWEST CARGO®, registration number 4,670,508; (4) SWA®, registration number 2,313,710; (5) SOUTHWEST AIRLINES CARGO®, registration number 4,024,786; (6) SWABIZ®, registration number 3,011,430; (7) SWABIZ MEETINGS®, registration number 4,537,010; (8) SWACARGO.COM®, registration number 4,033,508; (9) SOUTHWEST.COM®, registration number 2,623,807; (10) SOUTHWEST VACATIONS®, registration number 4,331,036; (11) the Southwest plane mark, a visual mark consisting of a profile of an airplane that is colored blue on the front and middle body of the plane, as well as the engines of the plane, with color bands of silver, yellow, silver, red,

silver, and blue at the rear of the plane, and the colors yellow and red on the vertical ends of the main wings of the airplane, registration number 4,770,643; (12) the Southwest heart mark, a visual mark consisting of a stylized silver heart with blue, red, and yellow bands running diagonally starting from the top left, registration number 4,720,322; and (13) the Southwest word and heart mark, consisting of the word "SOUTHWEST" in blue, positioned to the left of a stylized heart with blue, red, and yellow bands running diagonally starting from the top right, registration number 5,149,729. *Id*. at 5-6; Additional Attachments to Complaint (docket entry 2), Exhibit A-Exhibit M.

Southwest also maintains a privately-owned computer system, which includes Southwest's website, www.southwest.com, as well as other supporting services. Complaint at 8. Although Southwest makes its websites available to consumers, consumers must agree to the terms and conditions of Southwest's use agreement, which makes clear to consumers that the systems and data displayed on Southwest's websites are proprietary and owned by Southwest. *Id*. This use agreement is referenced by an interactive link on each page of Southwest's websites, including the pages shown to Southwest customers as they search, select, and purchase flights online. *Id*. at 9. Additionally, Southwest's use agreement does not permit page-scraping or the use of other automated tools designed to access or monitor Southwest's website, its content, or its underlying fare databases. *Id*.; Additional

- 3 -

Attachments to Complaint, Exhibit O.  In fact, under the section of the use

agreement entitled "Restrictions and Prohibited Activities," the agreement states in

pertinent part that a customer will not:

> (ii) use the Service or Company Information for any commercial purpose, with the exception of authorized Southwest travel agents/agencies;

> * * *

> (v) harvest any information from the Service;

> * * *

> (viii) interfere with the proper operation of or any security measure used by the Service;

> * * *

> (xiv) use any deep-link, page-scrape, robot, crawl, index, spider, click spam, macro programs, Internet agent, or other automatic device, program, algorithm or methodology which does the same things, to use, access, copy, acquire information, generate impressions or clicks, input information, store information, search, generate searches, or monitor any portion of the Service or Company information;

> (xv) use the Service in any way which depletes web infrastructural resources, slows the transferring or loading of any web page, or interferes with the normal operation of the Sites;

> * * *

> (xvii) disguise the origin of information transmitted to, from, or through the Service;

(xviii) circumvent any measures implemented by Southwest aimed at preventing violations of the Terms. You may not violate the restrictions in any robot exclusion header; or

(xix) otherwise violate these Terms or any Applicable Additional Terms.

Complaint at 10;  Additional Attachments to Complaint, Exhibit O.

The defendants in this case are Roundpipe, Yurevich, and Roberts.  Roundpipe is a Utah limited liability company with its principal place of business in Salt Lake City, Utah, whose sole member is Roberts.  Complaint at 2.  Roberts is a resident of Utah, as well as the programmer who helped design the website at issue in this case, www.SWMonkey.com.  *Id*.; Memorandum in Support of Defendants' Motion to Dismiss (docket entry 24) at 1.  Yurevich is a resident of Washington as well as the person who thought of the idea for www.SWMonkey.com.  Complaint at 2; Memorandum in Support of Defendants' Motion to Dismiss at 1.  None of the defendants in this case has any rights or ownership interest in Southwest's trademarks, nor are they authorized to use them.  Complaint at 7.

This dispute revolves around the website www.SWMonkey.com, created by Yurevich and Roberts and launched through Roundpipe in early November 2017.  Memorandum in Support of Defendants' Motion to Dismiss at 1.  As noted above, the idea for the website was originally conceived by Yurevich, who knew that Southwest had a policy allowing customers to change their tickets without paying a

fee.  *Id*.  Yurevich recognized that Southwest's no-fee policy essentially meant that if a customer's ticket was reduced in price after the customer's purchase, the customer could use this policy and exchange his original ticket for the lower-priced ticket, thereby saving the difference in fare.  *Id*.  Yurevich also recognized, however, that to take advantage of this policy consumers would have to constantly monitor Southwest's website to determine if their ticket price had dropped.  *Id*.  To get around this problem Yurevich conceived the idea of providing a price monitoring service in the form of a website which would provide consumers an alert when their ticket price dropped so that they would know when to exchange their tickets to reap savings.  *Id*.  Accordingly, Yurevich reached out to Roberts, a programmer who had experience building programs designed to pull data from websites, and the two developed www.SWMonkey.com and launched it in early November, 2017.  *Id.*; *see also* Additional Attachments to Complaint, Exhibit S (explaining that to make the website, Yurevich contacted Roberts, "who had experience building scrapers, or programs that pull data from websites.").

The original version of the SWMonkey website operated by scraping information about ticket fares off Southwest's website and using that information to alert customers who signed up through www.SWMonkey.com that their ticket prices had dropped.  Complaint at 11; Additional Attachments to Complaint, Exhibit Q (travel blog post explaining that the defendants' website would monitor ticket prices

on Southwest's website for customers; the owner of the travel blog informed the defendants that their scraping activities would undoubtedly be met with legal action from Southwest); Additional Attachments to Complaint, Exhibit S.  The original www.SWMonkey.com website also required consumers pay a three-dollar charge to utilize the automatic price-checking service, provided the customer saved ten dollars or more through using the defendants' website.  *See* Additional Attachments to Complaint, Exhibit R ("There is a $3 dollar charge for this service to check your flight price daily and text you if your [f]light decreases in price.  You only pay, however, IF they are able to save you $10 or more."); Memorandum in Support of Defendants' Motion to Dismiss at 1 ("Roundpipe stood to make three dollars if it saved this customer at least ten dollars.").

Upon its launch, www.SWMonkey.com was met with initial success.  On November 6, 2017, www.SWMonkey.com got its first customer.  Memorandum in Support of Defendants' Motion to Dismiss at 1.  On the same date, a travel blog posted about the defendants' website and promoted the services it offered. Additional Attachments to Complaint, Exhibit Q.  Ultimately, about 40 people signed up to use www.SWMonkey.com during its launch.  Additional Attachments to Complaint, Exhibit S (blog post explaining that "[a]bout 40 people signed up for the service, which convinced [Yurevich and Roberts] the business was viable.").  The momentum generated by the initial success of the defendants' website was slowed,

however, as Southwest began to send cease-and-desist letters to the defendants regarding the wwww.SWMonkey.com website.

First, on November 8, 2017, Southwest sent the defendants a cease-and-desist letter explaining that Southwest had become aware that the defendants' website was using Southwest's proprietary and trademarked names and logos in connection with the defendants' business. Complaint at 7; Memorandum in Support of Defendants' Motion to Dismiss at 1; Additional Attachments to Complaint, Exhibit N. In particular, this letter explained that it constituted a demand for the defendants to stop using, in any way, Southwest's intellectual property without Southwest's consent. Additional Attachments to Complaint, Exhibit N. Moreover, the letter warned that "should you fail to immediately [c]ease and [d]esist, Southwest will vigorously pursue all remedies and actions available, . . . and Southwest will seek recoupment of all expenses associated with such actions, including attorneys' fees and costs." *Id*.

Two days later, on November 10, 2017, Southwest sent the defendants a second cease-and-desist letter. Complaint at 13; Memorandum in Support of Defendants' Motion to Dismiss at 1; Additional Attachments to Complaint, Exhibit T. Unlike the first letter, Southwest's second letter stated that Southwest had become aware that www.SWMonkey.com was violating the terms of Southwest's use agreement by offering third party services not approved by Southwest and by

extracting or scraping Southwest's flight and fare information from its servers and websites. Additional Attachments to Complaint, Exhibit T. Accordingly, Southwest's second letter demanded that the defendants stop scraping Southwest's flight and fare information and cease publishing this information on www.SWMonkey.com or elsewhere. *Id*. This letter also warned that "Southwest may pursue formal legal action to recover damages for and to stop the unauthorized use of its website." *Id*.

Despite receiving these two letters, the defendants did not shut down their website. Complaint at 14. Southwest thus sent the defendants an additional cease-and-desist email on November 15, 2017. *Id*; Memorandum in Support of Defendants' Motion to Dismiss at 2; Additional Attachments to Complaint, Exhibit U. In pertinent part, the November 15 email expressed that Southwest was "surprised and disappointed" that the defendants continued to maintain their website. Additional Attachments to Complaint, Exhibit U. Much like the previous letters, Southwest also stated in the November 15 letter that it would pursue litigation against the defendants if they failed to comply. *Id*.

The next day, on November 16, the defendants blogged about receiving Southwest's cease-and-desist letters and linked this blog post on www.SWMonkey.com. Complaint at 14; Memorandum in Support of Defendants' Motion to Dismiss at 2; Additional Attachments to Complaint, Exhibit V. In this

post, the defendants catalogued their excitement over creating www.SWMonkey.com as well as their subsequent disappointment caused by receiving multiple cease-and-desist letters from Southwest. Additional Attachments to Complaint, Exhibit V. Additionally, the defendants asserted in this blog post that they did not believe they were using any of Southwest's intellectual property, since the only Southwest image on their website was a public domain image of a Southwest plane. *Id*. Furthermore, the defendants used this post to attack Southwest's claims that the defendants' automatic scraping of Southwest's website was illegal, arguing that the problem with Southwest's argument is "that they are making this information public. To restrict someone from accessing public information is a violation of our basic rights." *Id*. The defendants then concluded their post with a reaffirmation that the defendants would continue their website. *Id*.

Over the next few weeks, the defendants communicated with more travel blogs, prompting several articles to appear online discussing the dispute between Southwest and the defendants. Memorandum in Support of Defendants' Motion to Dismiss at 2; Declaration of Pavel Yurevich (docket entry 24-1) ¶ 6. During this time, counsel for the defendants and counsel for Southwest communicated with each other. Memorandum in Support of Defendants' Motion to Dismiss at 2. Specifically, on November 18, 2017 Southwest's counsel emailed counsel for the defendants, explaining his availability to discuss these issues and demanding that the

issues be resolved before November 22, 2017.  *Id*.; Appendix in Support of

Defendants' Motion to Dismiss (docket entry 24-1) at 8.  Counsel for the defendants

responded quickly, and the lawyers for both parties had a telephone conference on

the morning of November 20, 2017.  Memorandum in Support of Defendants'

Motion to Dismiss at 2.  Later that day, Southwest's counsel sent another email

stating that Southwest took this issue very seriously and that Southwest would not

make a goodwill payment to the defendants to shut down their website. Appendix in

Support of Defendants' Motion to Dismiss at 16.  In the same email, Southwest's

counsel warned counsel for the defendants that "[y]our clients either need to shut

down the website or prepare to answer our federal lawsuit."  *Id*.

In response to this email, the defendants disabled their website's functionality

on November 21, 2017, and sent an email to Southwest to confirm that they had

done so.  Memorandum in Support of Defendants' Motion to Dismiss at 3; Appendix

in Support of Defendants' Motion to Dismiss at 19.  Despite receiving this email,

Southwest maintains that the defendants did not stop using their automatic scraping

tool on Southwest's website until November 28, 2017.  Complaint at 14; Additional

Attachments to Complaint, Exhibit W.  In any event, because of Southwest's

cease-and-desist letters. the defendants removed all scraping functionality from their

website, effectively ending the defendants' ability to track and monitor Southwest's

ticket and fare prices for customers.  Memorandum in Support of Defendants'

Motion to Dismiss at 3.

Even though the defendants removed the scraping functionality from their

website, however, the defendants kept www.SWMonkey.com online as a modified

website, which the court will refer to as the disabled site.   Complaint at 15;

Memorandum in Support of Defendants' Motion to Dismiss at 3. On the disabled

site, the defendants included a new "thank you" section, explaining why the website

was no longer in operation.  Memorandum in Support of Defendants' Motion to

Dismiss at 3.  Furthermore, the disabled site also included a "Frequently Asked

Questions" section, which customers could use to find a link posted by the

defendants to another website that contained an open source tool for checking

Southwest's flight and fare information individually.  *Id*.

After discovering that the defendants' website was not fully taken down, on

November 21, 2017, Southwest sent the defendants an email demanding that the

defendants take down their entire website, "including the recently revised FAQ."

Memorandum in Support of Defendants' Motion to Dismiss at 3-4; Appendix in

Support of Defendants' Motion to Dismiss at 32.  The next day, on November 22,

Southwest sent its final cease-and-desist letter.  Memorandum in Support of

Defendants' Motion to Dismiss at 3-4; Response to Defendants' Motion to Dismiss

(docket entry 25) at 5; Appendix in Support of Response to Defendants' Motion to

Dismiss (docket entry 26) at 111-113.  By way of this final letter, Southwest not only reminded the defendants of their original violations, but also alleged the disabled site raised additional issues.  Appendix in Support of Response to Defendants' Motion to Dismiss at 111-113.  Moreover, Southwest stated that it would pursue formal legal action unless the defendants confirmed in writing each of the following: "(1) [t]heir written agreement to comply with Southwest's Terms [and] Conditions; (2) [t]heir agreement to cease operation of the [w]ebsite and removal of all related information from the internet; (3) [t]heir agreement to notify travel-related websites . . . that the [w]ebsite will be removed from the internet for violations of Southwest's Terms and Conditions; (4) [t]heir agreement to cease using Southwest Airlines' trademarks in connection with the [w]ebsite or any related commercial ventures; and (5) [t]heir confirmation that any existing materials containing any of Southwest Airlines' trademarks have been deleted or destroyed[.]"  *Id*. at 113.  As a final demand, Southwest required the defendants to provide written confirmation related to all conditions on or before November 27, 2017.  *Id*.

Counsel for the defendants responded to Southwest's final cease-and-desist letter on November 28, a day after the deadline imposed by Southwest.  Memorandum in Support of Defendants' Motion to Dismiss at 4; Response to Defendants' Motion to Dismiss at 5; Appendix in Support of Defendants' Motion to Dismiss at 53-55.  In this reply, counsel for the defendants explained that: (1) the

defendants website had not, and does not, infringe upon Southwest's trademarks; (2) it is unclear how the disabled site can give rise to any causes of action; and (3) the defendants had considered this matter resolved. *Id*. Additionally, the response submitted by counsel for the defendants also rejected each of the demands Southwest made in its final letter. *Id*. at 54-55. After receiving this response, Southwest sent back an email once again expressing its disappointment and explaining that it planned to pursue litigation. Appendix in Support of Defendants' Motion to Dismiss at 57. The next day, on November 28, 2017, without any further communication with Southwest, the defendants filed a declaratory judgment action in the federal district court for the district of Utah. Response to Defendants' Motion to Dismiss at 1 n. 1, 5.

## B. Procedural Background

After issuing multiple warnings that it would file suit, Southwest filed its complaint in this case on January 5, 2018. *See* Complaint. Months later, on March 6, 2018, the defendants filed their motion to dismiss. *See* Motion to Dismiss. Southwest filed its response to the defendants' Motion to Dismiss on March 27, 2018. *See* Response to Defendants' Motion to Dismiss. The defendants filed their reply on April 10, 2018. *See* Reply to Defendants' Motion to Dismiss ("Reply") (docket entry 27).

Two months later, on June 12, 2018, Southwest filed its request to dismiss the portions of the defendants' motion to dismiss brought under the TCPA as well as its request for attorneys' fees. *See* Request to Dismiss. The defendants filed their response to this motion on July 3, 2018. *See* Defendants' Response to Southwest's Request to Dismiss Defendants' TCPA Ground and Request for Attorneys Fees ("Response to Request to Dismiss") (docket entry 30). Southwest did not file a reply in support of its request to dismiss. Additionally, the defendants have not yet filed an answer to Southwest's complaint. Regardless, at this juncture both the defendants' motion to dismiss and Southwest's request to dismiss the defendants' TCPA grounds and request for attorneys' fees are ripe for decision.

## II.  ANALYSIS

In their motion to dismiss, the defendants urge two separate grounds of dismissal. *See* Memorandum in Support of Defendants' Motion to Dismiss. First, the defendants seek to dismiss claims one and six of Southwest's complaint pursuant to the TCPA, Texas's anti-SLAPP[1] statute. *Id*. at 5-13. Second, the defendants seek to dismiss the entirety of Southwest's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Id.* at 13-24. Finding these grounds of dismissal to be vastly different, the court will analyze each ground separately.

---

[1]     SLAPP is an acronym for "strategic litigation against public participation." *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 746 n. 3 (5th Cir. 2014).

A.  Legal Standard

1.  *TCPA Standard*

The TCPA "protects citizens who petition or speak on matters of public concern from retaliatory lawsuits that seek to intimidate or silence them." *In re Lipsky,* 460 S.W.3d 579, 584 (Tex. 2015) (citing Texas Civil Practice & Remedies Code §§27.001-.011).  "The purpose of the statute is 'to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law, and at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury.'" *Misko v. Backes*, No. 3:16-CV-3080-M-BT, 2018 WL 2335466, at *1 (N.D. Tex. May 4, 2018) (Rutherford, M.J.) (quoting Texas Civil Practice & Remedies Code § 27.002).  To achieve this purpose, "the TCPA provides a means for a defendant, early in the lawsuit, to seek dismissal of certain claims in the lawsuit." *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 725 F.3d 742, 746 (5th Cir. 2014) (citing Texas Civil Practice & Remedies Code § 27.003(a)).  In particular, "[i]f a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association, that party may file a motion to dismiss the legal action."  *Id*. (citing Texas Civil Practice & Remedies Code § 27.003(a)).

Generally, a motion to dismiss brought under the TCPA must be filed no later than sixty days after service of the legal action, except where the court has extended the filing deadline upon a showing of good cause. *Id*. (citing Texas Civil Practice & Remedies Code § 27.003(b)). Additionally, a hearing on a motion to dismiss brought under the TCPA "must be set not later than the 60th day after the date of service of the motion unless the docket conditions of the court require a later hearing, upon a showing of good cause, or by agreement of the parties." Texas Civil Practice & Remedies Code § 27.004. Even if an extension for the hearing is given for one of these three reasons, "in no event shall the hearing occur more than 90 days after service of the motion under Section 27.003," except where the court allows discovery on the motion to dismiss and thereby extends the hearing date to allow discovery. *Id*. Moreover, even if a court grants an extension for the hearing to allow discovery, in no event "shall the hearing occur more than 120 days after the service of the motion under Section 27.003." *Id*.

Importantly, the TCPA also provides that a "court must rule on a motion [to dismiss] under Section 27.003 not later than the 30th day following the date of the hearing on the motion." *Id*. § 27.005(a). If a court fails to make a ruling on the motion to dismiss within this time frame, "the motion is considered to have been denied by operation of law and the moving party may appeal." *Id*. § 27.008(a).

To make clear what each party must prove on a motion to dismiss brought under the TCPA, the TCPA establishes a burden-shifting regime. See *id*. § 27.005. First, section 27.005(b) establishes that "[t]he movant has the initial burden to show, by a preponderance of evidence, that the activity that forms the base of the claim against him is protected by the statute–that is to say, that the suit arises from the movant's exercise of his right to free speech, association, or petition." *Cuba v. Pylant*, 814 F.3d 701, 711 (5th Cir. 2016). If the movant meets his burden, then the burden shifts to the party opposing dismissal to establish by "clear and specific evidence a prima facie case for each essential element of the claim in question." Texas Civil Practice & Remedies Code § 27.005(c).[2] Finally, if the party opposing dismissal satisfies its burden, the burden returns to the moving party, who can still obtain dismissal claims if he "establishes by a preponderance of the evidence each essential element of a valid defense to the nonmovant's claim." *Id*. § 27.005(d).

---

[2] "The 'clear and specific evidence' requirement, however, as interpreted by Texas courts, is more like a pleading requirement than a summary-judgment standard." *Cuba*, 814 F.3d at 711. In fact, the TCPA section titled "Evidence" provides that "[i]n determining whether a legal action should be dismissed under this chapter, the court shall consider the pleadings and supporting and opposing affidavits stating the facts on which the liability or defense is based." Texas Civil Practice & Remedies Code § 27.006(a). "And the Texas cases inform that a litigant's evidentiary burden in a TCPA motion may be satisfied by either detailed pleading or supporting affidavits: A party need not provide "'evidence' in the traditional sense if the pleadings are sufficiently clear." *Cuba*, 814 F.3d at 711 (collecting Texas cases explaining that, under the TCPA, a party need not present testimony or other evidence to satisfy his burden but may instead rely on pleadings or affidavits).

## 2. *Rule 12(b)(6) Standard*

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 570 (2007)), *cert. denied*, 552 U.S. 1182 (2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Twombly*, 550 U.S. at 555 (citations, quotations marks, and brackets omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina Canal*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal quotation marks omitted). "The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id*. (quoting *Martin K. Eby Construction Company, Inc. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)) (internal quotation marks omitted).

The Supreme Court has prescribed a "two-pronged approach" to determine whether a complaint fails to state a claim under Rule 12(b)(6). See *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The court must "begin by identifying the pleadings

that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id*. at 679. The court should then assume the veracity of any well-pleaded allegations and "determine whether they plausibly give rise to an entitlement of relief." *Id*. The plausibility principle does not convert the Rule 8(a)(2) notice pleading to a "probability requirement," but "a sheer possibility that a defendant has acted unlawfully" will not defeat a motion to dismiss. *Id*. at 678. The plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (alteration in original) (quoting Federal Rule of Civil Procedure 8(a)(2)). The court, drawing on its judicial experience and common sense, must undertake the "context-specific task" of determining whether the plaintiff's allegations "nudge" its claims against the defendants "across the line from conceivable to plausible." See *id*. at 679, 683.

B. <u>Application</u>

1. *Applicability of the TCPA*

The threshold question the court must address is whether Texas's anti-SLAPP law applies to Southwest's first and sixth claims.[3]  Because the court exercises both supplemental and diversity jurisdiction over these claims, *see* 28 U.S.C. §§ 1367(a), 1332, the court must apply Texas substantive law to them.  *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan*, 883 F.2d 345, 353 (5th Cir. 1989) ("A federal court exercising pendent jurisdiction over state law claims must apply the substantive law of the state in which it sits."); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").  Accordingly, the court is first tasked with determining whether Texas's anti-SLAPP law is substantive.

"The Fifth Circuit has not decided whether the TCPA applies in federal court when a court exercises its diversity or supplemental jurisdiction over state-law

---

[3]     Because the defendants only seek dismissal of Southwest's state law claims–specifically Southwest's first claim for breach of contract and Southwest's sixth claim for breach of computer security in violation of Texas Penal Code § 33.02– the court's decision does not address whether the TCPA would apply to Southwest's claims arising under federal law.  Nevertheless, because the court exercises federal question jurisdiction over all of Southwest's federal claims, state laws such as the TCPA would not apply.  See *N.P.U., Inc. d/b/a NE Plus Ultra v. Wilson Audio Specialties, Inc.*, 343 F. Supp. 3d 661, 664 (W.D. Tex. 2018) ("The [c]ourt exercises federal question jurisdiction over that claim and the two counterclaims arising under the Lanham Act . . . The [c]ourt does not apply state law to those claims.  The TCPA therefore provides no basis for dismissing [claims] arising under federal law.").

claims." *N.P.U., Inc. d/b/a NE Plus Ultra v. Wilson Audio Specialties, Inc.*, 343 F. Supp. 3d 661, 665 (W.D. Tex. 2018) (citing *Block v. Tanenhaus*, 867 F.3d 585, 589 (5th Cir. 2017)); *Cuba*, 814 F.3d at 701, 706 (assuming, without deciding, that the TCPA's procedural rules apply in federal court). As a result, there is a split among district courts as to whether the TCPA is substantive and thus applicable in federal court. Compare *Allen v. Heath*, No. 6:16-CV-51-MHS-JDL, 2016 WL 7971294, at *3 (E.D. Tex. May 6, 2016), *report and recommendation adopted*, No. 6:16-CV-51, 2016 WL 3033561 (E.D. Tex. May 27, 2016) (finding that the TCPA's basis for dismissal is substantive and does not conflict with the Federal Rules of Civil Procedure); *Williams v. Cordillera Communications, Inc.*, No. 2:13-CV-124, 2014 WL 2611746, at *1 (S.D. Tex. June 11, 2014) (finding that the TCPA's basis for dismissal is substantive and should apply in federal court partly because the Fifth Circuit had previously concluded that the Louisiana anti-SLAPP statute applied in federal court and the Texas and Louisiana anti-SLAPP statutes are similar); *Khalil v. Memorial Hermann Health System*, No. H-17-1914, 2017 WL 5068157, at *4 (S.D. Tex. Oct. 30, 2017) ("Although the Fifth Circuit has not decided this issue, its previous assumption that the [TCPA] applies in federal court and its application of the similar Louisiana anti-SLAPP statute are persuasive."); *Banik v. Tamez*, No. 7:16-CV-462, 2017 WL 1228498, at *2 (S.D. Tex. Apr. 4, 2017) (concluding that the TCPA should apply in federal court because the Fifth Circuit had previously ruled on state

anti-SLAPP statutes); with *Thoroughbred Ventures, LLC v. Disman*, No. 4:18-CV-0318, 2018 WL 3472717, at *2-*3 (E.D. Tex. July 19, 2018) (concluding that TCPA is procedural and that it conflicts with Federal Rules of Civil Procedure 12 and 56); *Mathiew v. Subsea 7 (US) LLC*, No. 4:17-CV-3140, 2018 WL 1515264, at *5-*7 (S.D. Tex. Mar. 9, 2018), *report and recommendation adopted*, No. 4:17-CV-3140, 2018 WL 1513673 (S.D. Tex. Mar. 26, 2018) (same); *Wilson Audio Specialties, Inc.*, 343 F. Supp. 3d at 665-66 (same); *Rudkin v. Roger Beasley Imports, Inc.*, No. A-17-CV-849-LY, 2017 WL 6622561, at *2-*3 (W.D. Tex. Dec. 28, 2017), *report and recommendation adopted*, No. A-17-CV-849-LY, 2018 WL 2122896 (W.D. Tex. Jan. 31, 2018) (same).

Here, Southwest argues that the TCPA is procedural and thus inapplicable in federal court because it conflicts with the Federal Rules of Civil Procedure. Response to Defendants' Motion to Dismiss at 7, 14-15. In particular, Southwest contends that the TCPA's basis for dismissal directly conflicts with Federal Rules of Civil Procedure 12 and 56, since the TCPA establishes different procedures and evidentiary standards for pre-trial dismissal of certain suits that infringe upon speech rights protected by the constitution. *Id*. at 14-15. To support its argument, Southwest relies upon the court's analysis in *Rudkin* as well as Judge Grave's dissent in *Cuba*, which both determined that the TCPA was procedural and in conflict with Federal Rules of Civil Procedure 12 and 56. *Id*. at 7, 14-15 (citing *Rudkin*, 2017 WL 6622561, at *3; *Cuba*, 814 F.3d at 719). Additionally, Southwest cites opinions

from other circuit courts of appeals, in which similar anti-SLAPP laws were found to be procedural and thus inapplicable in federal court. *Id*. at 7 (citing *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015); *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, No. 16-2046, 2018 WL 1279752 (10th Cir. 2018)).

The defendants, on the other hand, contend that the TCPA is substantive and thus should be applied in this case. Reply at 1-4. Although the defendants admit that the Fifth Circuit has not determined this issue, they urge the court to adopt the First Circuit's reasoning in *Godin v. Schenks*, 629 F.3d 79 (1st Cir. 2010), where the First Circuit concluded that Maine's anti-SLAPP statute was substantive. *Id*. at 2-4. In addition, to support their assertion that the TCPA should be applied by this court, the defendants list opinions from district courts within the Fifth Circuit that have applied the TCPA. *Id*. at 1 (citing *Khalil*, 2017 WL 5068157, at *4; *Banik*, 2017 WL 1228498, at *2; *Walker v. Beaumont Independent School District*, No. 1:15-CV-379, 2016 WL 1156852 (E.D. Tex. Mar. 24, 2016)).

After reviewing both parties' positions, and upon careful consideration of the opinions that have already considered this issue, the court concludes that the TCPA is procedural and thus joins those courts that do not apply the TCPA in federal court.

First, the court finds persuasive Judge Grave's dissent in *Cuba*. There, in evaluating whether the TCPA should apply in Federal Court, Judge Graves explained that:

> Applying an *Erie* analysis, I conclude that the TCPA is procedural and must be ignored. The TCPA is codified in the Texas Civil Practice and Remedies Code, provides for a pre-trial motion to dismiss claims subject to its coverage, establishes time limits for consideration of such motions to dismiss, grants a right to appeal a denial of the motion, and authorizes the award of attorneys' fees if a claim is dismissed. This creates no substantive rule of Texas law; rather, the TCPA is clearly a procedural mechanism for speedy dismissal of a meritless lawsuit that infringes on certain constitutional protections.

*Cuba*, 814 F.3d at 719. The court agrees with Judge Graves that the TCPA is not substantive law. The TCPA only provides the procedural means by which a party may seek to quickly dismiss a suit predicated on that party's exercise of certain First Amendment rights.

Second, the court is unpersuaded by the defendants' reliance on *Godin*. There, the First Circuit evaluated Maine's anti-SLAPP statute and concluded that it was substantive because neither Rule 12 nor Rule 56 of the Federal Rules of Civil Procedure were broad enough to cover the same ground as Maine's anti-SLAPP statute. *Godin*, 629 F.3d at 87-91. In particular, the *Godin* court concluded that Rule 12(b)(6) did not cover the same ground as Maine's anti-SLAPP statute since Rule 12(b)(6) only served to test the sufficiency of a complaint, whereas Maine's anti-SLAPP statute provided an entirely different mechanism for dismissal based on the defendant's petitioning conduct. *Id*. at 89. As for Rule 56, the First Circuit determined that Maine's anti-SLAPP statute covered separate grounds than the

summary judgment rule because the anti-SLAPP statute served "the entirely distinct function of protecting those specific defendants that have been targeted with litigation on the basis of their protected speech." *Id*. In addition, the First Circuit determined that the burden-shifting regime and legal defenses contained within Maine's anti-SLAPP statute provided further evidence that Maine's anti-SLAPP statute and the Federal Rules of Civil Procedure did not occupy the same field. *Id*. at 89-90. Finally, the First Circuit concluded that applying Maine's anti-SLAPP statute in federal court would best serve the twin aims of *Erie*, because declining to apply it would create incentives for plaintiffs to forum shop and bring state-law claims in federal court solely to avoid Maine's anti-SLAPP statute. *Id*. at 92.

Here, however, the court is not concerned with Maine's anti-SLAPP statute, nor does the court find that the TCPA is identical to the statute at issue in *Godin*. While the two anti-SLAPP statutes share similar features, the court concludes that Texas's anti-SLAPP statute contains certain elements that place it in direct conflict with Federal Rules of Civil Procedure 12(b)(6) and 56. For instance, the TCPA provides that to survive a TCPA motion to dismiss, a plaintiff must provide "clear and specific" evidence of a prima facie case. Texas Civil Practices & Remedies Code § 27.005. "This mandate requires evidence that is 'umambiguous, sure, or free from doubt,' 'explicit or relating to a particular named thing,' and that 'support[s] a rational interference that the allegation of fact is true.'" *Cuba*, 814 F.3d at 719

(Graves, dissenting) (citing *In re Lipsky*, 460 S.W.3d at 590) (changes in original).  As

Judge Graves stated in his *Cuba* dissent:

> This obviously conflicts with Rule 12.  To overcome a Rule
> 12(b)(6) motion to dismiss, a plaintiff must allege facts
> sufficient to state a claim that is plausible on its face.
> *Lexington Insurance Co. v. S.H.R.M. Catering Services, Inc.*,
> 567 F.3d 182, 184 (5th Cir. 2009). "[A] well-pleaded
> complaint may proceed even if it strikes a savvy judge that
> actual proof of those facts is *improbable*, and that a recovery
> is very *remote and unlikely*."  *Leal v. McHugh*, 731 F3d 405,
> 413 (5th Cir. 2013) (quoting *Bell Atlantic Corp. v. Twombly*,
> 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.E.2d 929
> (2007)) (emphasis added).  This is a clear conflict with the
> TCPA's requirement that the evidence be "unambiguous,
> sure, or free from doubt."

*Cuba*, 814 F.3d at 719-720 (changes and emphasis in original).

More importantly, however, the court has a fundamental disagreement with

the *Godin* court's conclusion that the anti-SLAPP act in question did not cover the

same ground as Rules 12(b)(6) and 56.  In the court's view, both the anti-SLAPP

statute at issue in *Godin* and the TCPA cover the same ground as Rules 12(b)(6) and

56, because Rules 12(b)(6) and 56 answer the same questions as the anti-SLAPP

statutes about the circumstances in which a court must dismiss a case before trial.

*Abbas*, 783 F.3d at 1333-34.  Accordingly, "[t]here is no doubt that the TCPA

directly conflicts with the 'integrated program of pre-trial . . . [federal] procedures

designed to ensure the just, speedy, and inexpensive determination of every action

and proceeding."  *Cuba*, 814 F.3d at 720 (Graves, dissenting) (citing *Makaeff v. Trump*

*University, LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, concurring) (internal quotations and citations omitted)).  Therefore, the court concludes that the TCPA is not applicable in federal court.  Moreover, for these same reasons, the court finds that even if the TCPA were substantive, "then it still must yield to federal law" because it conflicts with Federal Rules of Civil Procedure 12(b)(6) and 56.  *Cuba*, 814 F.3d at 719 (Graves, dissenting).

Third, the court is not convinced by the defendants' argument that it should apply the TCPA because other district courts within the Fifth Circuit have previously done so.  A thorough review of the cases cited by the defendants reveals that a common thread ties them together.  That is, the decisions cited by the defendants either applied the TCPA without discussing its applicability in federal court or applied the TCPA based on the Fifth Circuit's decision in *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 164 (5th Cir. 2015).  See *Vu v. Vu*, No. H-16-0366, 2016 WL 3181168, at *4-*5 (S.D. Tex. June 3, 2016) (applying the TCPA without discussing its applicability in federal court); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 991-995 (S.D. Tex. Aug. 7, 2019) (same); *Khalil*, 2017 WL 5068157, at *5 (applying TCPA based on Fifth Circuit's *Henry* decision); *Banik*, 2017 WL 1228498, at *2 (same); *Walker*, 2016 WL 1156852, at *1 (same).  As to the cases cited by the defendants that provided no discussion of the TCPA's applicability in federal court, the court is unpersuaded.  Nothing in these decisions convinces the court that the

TCPA is substantive or that it should be applied in the instant action. The court is similarly unconvinced by the decisions cited by the defendants that applied the TCPA based on the Fifth Circuit's decision in *Henry*. In *Henry*, the Fifth Circuit applied Louisiana's anti-SLAPP statute but did not discuss whether the statute was procedural or substantive. *Henry*, 566 F.3d at 169-170; see also *Block v. Tanenhaus*, 867 F.3d 585, 589 n. 2 (5th Cir. 2017) ("These opinions post-date our decision in *Henry v. Lake Charles American Press, L.L.C.*, 566 F.3d 154 (5th Cir. 2009), which stated without explanation that 'Louisiana law, including the nominally-procedural Article 971, governs this diversity case.'"). What is more, "[t]he district courts that have relied on *Henry* have similarly failed to supply that analysis; they note only that the TCPA is similar to Louisiana's anti-SLAPP statute." *Wilson Audio Specialties, Inc.*, 343 F. Supp. 3d at 667 (citing *Khalil*, 2017 WL 5068157, at *4). Therefore, because the court can find no binding authority extending *Henry* to the TCPA, nor have the defendants provided a reason to persuade the court to do so, the court concludes that the TCPA does not apply in federal court.[4] See *id*. ("Without binding authority

---

[4]     Although not cited by the defendants, the court is also not persuaded by the court's reasoning in *Allen v. Heath*, No. 6:16-CV-51-MHS-JDL, 2016 WL 7971294, at *3 (E.D. Tex. May 6, 2016), *report and recommendation adopted*, No. 6:16-CV-51, 2016 WL 3033561 (E.D. Tex. May 27, 2016). The *Allen* court determined that the TCPA was substantive because "it ultimately provides a basis for dismissal that is inextricably tied to the substantive nature of [the] [p]laintiff's claims." *Allen*, 2016 WL 7971294, at *3. Like the court in *Wilson Audio Specialties, Inc.*, this court disagrees with the *Allen* court because "dismissal under the TCPA is based on a lack
(continued...)

extending *Henry* to the TCPA or any reason from [the] [p]laintiffs to persuade the [c]ourt to do so, the [c]ourt concludes that the TCPA does not apply in federal court." ).

Finally, even if the TCPA were substantive and thus applicable in federal court, the court agrees with Southwest that the defendants' failure to obtain a hearing on this issue within the statutory 90-day time period would mandate dismissal. As mentioned earlier, "[a]bsent a trial court's extension of the hearing date to allow discovery, the plain language of section 27.004 [of the TCPA] requires a hearing on a motion to dismiss to occur within ninety days." *Grubbs v. ATW Investments, Inc.*, 544 S.W.3d 421, 423 (Tex. App. – San Antonio 2017, no pet.) (citing Texas Civil Practice & Remedies Code § 27.004). If the party bringing a motion to dismiss under the TCPA fails to obtain a hearing within this time period, Texas courts have held that the party forfeits the protections afforded by the TCPA and that their TCPA motion may be dismissed. *Grubbs*, 544 S.W.3d at 425-426; see also *Morin v. Law Office of Kleinhans Gruber, PLLC*, No. 03-15-00174-CV, 2015 WL 4999045, at *4 (Tex. App. – Austin Aug. 21, 2015, no pet.) (concluding that the movant's failure to set a hearing within TCPA's time frame warranted denial of the TCPA motion to dismiss). Here, the defendants do not dispute that they failed to

---

[4](...continued)
of sufficient evidence no matter what the substance of a claim." *Wilson Audio Specialties, Inc.*, 343 F. Supp. 3d at 666.

schedule a hearing within the time limits set by the TCPA.  Response to Request to Dismiss at 1.  Instead, the defendants argue that their failure to set a hearing does not warrant denial.  *Id*.

First, the defendants maintain that their failure to schedule a hearing does not warrant denial because the Fifth Circuit's opinion in *Cuba* establishes that the failure to set a hearing under the TCPA cannot result in the motion having been denied by operation of law.  *Id*. at 1-2.  In *Cuba*, the Fifth Circuit explained that where no hearing was set, a TCPA motion could not be denied by operation of law because the only statutory basis for a deemed denial is explicitly based on the clock's running after a hearing.  *Cuba*, 814 F.3d at 710.  In the Fifth Circuit's view, if no hearing occurred, then the "clock never started running."  *Id*.  The defendants thus argue that since no hearing was held in this case, the clock has not begun to run and their motion therefore cannot be denied for failure to timely obtain a hearing.  Response to Request to Dismiss at 1-2.

Southwest raises two arguments against the defendants' reliance on *Cuba*, both of which the court finds persuasive.  Request to Dismiss at 5-6.  First, Southwest explains that the Fifth Circuit's decision in *Cuba* is unrelated to both the instant action and the San Antonio Court of Appeals' decision in *Grubbs*.  The court agrees with Southwest.  In *Grubbs*, the issue was not whether the movant's failure to set a hearing within the time-period resulted in the motion being denied by operation of

law.  *Grubbs*, 544 S.W. 3d at 422.  Rather, the court in *Grubbs* was concerned with

whether the movant's failure to obtain a timely hearing warranted the trial court's

denial of the movant's motion because the hearing was untimely.  *Id*. at 422-426.

The Fifth Circuit's *Cuba* decision, on the other hand, was concerned with

determining when a TCPA motion to dismiss was overruled by operation of law

based on the court's failure to render a decision on the TCPA motion within a certain

time period, even though no hearing was held.

Second, Southwest argues that because the Fifth Circuit's *Cuba* decision

predates the San Antonio Court of Appeals' decision in *Grubbs*, that Fifth Circuit

precedent regarding *Erie* guesses would require the court to apply *Grubbs* and deny

the defendants' TCPA motion as untimely.  Request to Dismiss at 5-6.  This court

agrees.  As pointed out by Southwest, in the absence of an opinion from the state's

highest court, the Fifth Circuit has held that federal courts must make an *Erie* guess,

in which the courts defer to intermediate state appellate court decisions, unless

convinced that the state's highest court would decide otherwise.  *Id*. at 6 (quoting

*Carey v. Dreyfus Service Corp.*, 595 F.3d 219, 229 (5th Cir. 2010)).  Unlike the

situation when the Fifth Circuit decided *Cuba*, this court has the benefit of *Grubbs*, an

intermediate state court decision that held that a TCPA motion to dismiss may be

denied where the movant fails to obtain a hearing within ninety days after the

motion was served.  *Grubbs*, 544 S.W.3d at 425-26.  Finding no reasons that the

Texas Supreme Court would decide otherwise, in making an *Erie* guess on this issue, the court is bound to follow *Grubbs* and deny the defendants' TCPA motion as untimely.

Next, the defendants contend that *Grubbs* is inapplicable because it dealt with "state-court rules governing the scheduling of hearings, and state procedural rules have no application in federal court." Response to Request to Dismiss at 2. Instead, the defendants insist that Local Rule 7.1(g) controls whether a hearing is required. *Id*. The court disagrees. The defendants do not offer any explanation to the court as to how certain TCPA provisions are substantive, yet the TCPA's accelerated hearing requirements are purely procedural and should not be applied. Put simply, the court declines to allow the defendants to have their cake and eat it, too.

Lastly, the defendants contend that they were not required to schedule a hearing, because the TCPA does not specify that the movant must schedule the hearing. *Id*. While the defendants are correct that the statute only states that a hearing "must be set," Texas state court opinions have clarified that it is the movants burden to timely obtain a hearing. *Grubbs*, 544 S.W.3d at 425 (concluding that the movant had the burden to timely obtain a hearing in his efforts to invoke the TCPA's protections).

Ultimately, for the reasons stated above, the court finds that the TCPA provides no basis for dismissing Southwest's state law claims. Accordingly, the

defendants' motion to dismiss Southwest's first and sixth claims under the TCPA is denied. Furthermore, by denying the defendants' motion to dismiss under the TCPA, the court has mooted Southwest's request to dismiss the defendants' TCPA grounds. Therefore, the court denies as moot Southwest's request to dismiss and motion for attorneys' fees.[5]

### 2. *Application of Rule 12(b)(6)*

Now that the court has dealt with the defendants' TCPA arguments, the court must consider the merits of the remaining sections of the defendants' motion to dismiss. In these sections, the defendants contend that Southwest's entire complaint fails to state a claim upon which relief may be granted and thus should be dismissed under Federal Rule of Civil Procedure 12(b)(6). Memorandum in Support of Defendants' Motion to Dismiss at 13-24. Interestingly, the defendants neither discuss nor provide any analysis as to why Southwest's complaint fails to satisfy the pleading standards set forth in *Twombly*. *Id*. Instead, the defendants attempt to "hide the ball," so to speak, by bifurcating the discussion of their 12(b)(6) motion into two separate sections–the first arguing that Southwest's claims relating to the original www.SWMonkey.com fail due to Southwest's "promise" not to sue, and the second arguing that Southwest's claims against the disabled website fail because the

---

[5] Because Southwest sought attorney's fees under Section 27.005(b) of the TCPA, which the court has determined is inapplicable in federal court, Southwest may not receive fees under this section.

defendants have ceased all offending conduct.  *Id*.  The defendants' attempt to hide the ball fails, however.  Southwest did not file two separate complaints against the defendants, one alleging claims based on the original SWMonkey website and the other alleging claims based on the disabled site.  Nor are the claims raised by Southwest specific to certain versions of the defendants' website.  Rather, Southwest's complaint states that all of the defendants' actions—from starting SWMonkey.com to disabling its functionality but keeping the website online—form the factual basis for Southwest's claims.  *See generally*, Complaint.  As such, the court will not follow the defendants' lead and analyze Southwest's claims with respect to both versions of the defendants' website.  Rather, the court will simply examine whether Southwest's complaint is sufficiently well-plead to state claims upon which relief may be granted.

As previously noted, the defendants' main argument as to why Southwest's complaint fails under Rule 12(b)(6) has little to do with any alleged deficiencies in Southwest's complaint.  *Id*. at 13-20.  Rather, this argument is in all actuality the defendants' attempt to raise the affirmative defense of contractual estoppel.[6]  *Id*.;

---

[6]    At this point in time, the court is inclined to believe that labeling the defendants' argument as the affirmative defense of contractual estoppel is somewhat generous.  If anything, the court views the defendants' argument as a possible counter-claim for breach of contract.  Regardless, for the purposes of this memorandum opinion and order the court will entertain the defendants' argument and proceed as though the defendants are raising contractual estoppel as an

(continued...)

Reply at 5-9 (acknowledging that contractual estoppel is raised by the defendants as an affirmative defense). The crux of the defendants' contractual estoppel argument is that the defendants' compliance with Southwest's cease-and-desist letters created a unilateral contract that bound Southwest not to sue the defendants. Memorandum in Support of Defendants' Motion to Dismiss at 13-19. Specifically, the defendants allege that Southwest's repeated cease-and-desist letters constituted offers for the defendants to enter into a unilateral contract with Southwest, since these letters promised the defendants a benefit if they performed. *Id*. at 14-17 (citing *Westinde v. JPMorgan Chase Bank, N.A.*, No. 3:13-CV-3576-O, 2014 WL 4631405, at *5 (N.D. Tex. Sept. 16, 2014) ("In Texas, a unilateral contract is created by the promisor promising a benefit if the promisee performs.") (internal quotations and citations omitted) (O'Connor, J.)). To support this assertion, the defendants cite two non-binding decisions that, according to the defendants, establish that "[o]ffers to settle legal disputes can give rise to unilateral contracts." *Id*. at 15-16 (citing *Accurso v. Infra-Red Services, Inc.*, No. 13-7509, 2016 WL 1273878 at *4-*5 (E.D. Pa. Apr. 1, 2016); *In re H.E.Butt Grocery Co.*, 17 S.W.3d 360, 370 (Tex. App.–Houston [14th Dist.] 2000, no pet.)). Additionally, the defendants contend that by shutting down their website's functionality and ceasing to access Southwest's website to obtain

---

[6](...continued)
affirmative defense.

flight and fare information, that they complied with Southwest's cease-and-desist letters, thereby creating a unilateral contract. *Id*. at 18-19. The defendants further allege that Southwest did not uphold its end of the contract, since it brought suit against the defendants after they complied with Southwest's demands. *Id*. at 19. Accordingly, the defendants ask the court to dismiss Southwest's complaint as barred by contractual estoppel. *Id*.

Southwest, in its response brief, points out multiple problems with the defendants' 12(b)(6) motion to dismiss. Response to Defendants' Motion to Dismiss at 8-14. To start, Southwest explains that its complaint readily satisfies the *Twombly* standard, as well as the pleading standard set forth in Federal Rule of Civil Procedure 8. *Id*. at 8-10. Next, Southwest correctly urges that the defendants failed to challenge the sufficiency of Southwest's pleadings. *Id*. at 9. Additionally, Southwest raises three arguments as to why the defendants' contractual estoppel argument fails to support a motion to dismiss. *Id*. at 10-14. First, Southwest maintains that an affirmative defense is an improper ground upon which to base a Rule 12(b)(6) motion. *Id*. Specifically, Southwest contends that precedent makes clear that a Rule 12(b)(6) motion requires the court to only look at the pleadings, not affirmative defenses or allegations outside the pleadings. *Id*. at 11 (citing *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999)). Second, Southwest argues that its cease-and-desist letters were in no way offers to contract, since these letters made no promises and

only informed the defendants that if their improper conduct did not cease, Southwest would sue. *Id*. at 11-12. Third, Southwest contends that even if the court were to decide the defendants' contractual estoppel argument on summary judgment, there are multiple issues of material fact that preclude a grant of summary judgment on this ground. *Id*. at 13-14. In particular, Southwest contends that fact issues exist because: (1) Southwest's demands required the defendants to shut down their website, which the defendants did not do; and (2) the defendants' request for "nominal" payment in response to Southwest's cease-and-desist letters constituted a counter-offer. *Id*. Consequently, Southwest asks the court to deny the defendants' Rule 12(b)(6) motion to dismiss.

In their reply brief, the defendants admit that their contractual estoppel argument is an affirmative defense that relies on matters outside the pleadings. Reply at 6. The defendants argue, however, that the court should apply Rule 12(d) and consider the matters outside the pleadings, thereby converting the defendants' Rule 12(b)(6) motion into a motion for summary judgment under Rule 56. *Id*.; see also Federal Rule of Civil Procedure 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."). The defendants respond to a number of Southwest's arguments in their reply, too. Reply to Motion to Dismiss at 7-9. First, the defendants respond to Southwest's argument

that no contract was created because the defendants did not shut down their website by arguing that the literal reading of Southwest's letters, which demanded the entire website be shutdown, is not the reasonable interpretation of these letters. *Id*. at 7. Rather, the defendants maintain that "[t]he only reasonable interpretation of Southwest's demand letters was that Southwest was looking for Roundpipe to do two things: not infringe its trademarks and not scrape data from its website." *Id*. Second, the defendants respond to Southwest's contention that its cease-and-desist letters were not offers by arguing that "the only reasonable interpretation of the many-emails from Southwest's lawyer was that the only way to avoid being sued was to comply with his demands." *Id*. at 8. Finally, in response to Southwest's argument that the defendants request for a nominal payment was a counter-offer, the defendants maintain that their request for payment is not a counter-offer, and that even if it was, Southwest rejected it and re-tendered its original offer. *Id*. at 8-9.

After reviewing the parties' arguments, or lack thereof, the court concludes that the defendants' motion to dismiss Southwest's complaint under Rule 12(b)(6) should be denied.

When Southwest's factual allegations are taken as true and viewed in the light most favorable to Southwest–as the court is required to do–it is clear that Southwest's complaint states plausible claims for breach of contract, for violations of both the Computer Fraud and Abuse Act ("CFAA") and section 33.02 of the Texas

Penal Code ("THACA"), and for unfair competition, trademark infringement, and dilution under the Lanham Act. Specifically, the court concludes that Southwest's complaint states a plausible claim for breach of contract because Southwest's complaint not only identifies the existence of a valid contract (Southwest's use agreement) but it also explains how the defendants' use of automated scraping tools breached the contract and caused damage to Southwest. See, e.g., *Sullivan v. Bank of America, N.A.*, No. 3:14-CV-3186, 2014 WL 6977093, at *2-*4 (N.D. Tex. Dec. 10, 2014) (explaining the Rule 12(b)(6) standard as applied to a breach of contract claim under Texas law, and concluding that the plaintiff's complaint stated a plausible claim for breach of contract because the complaint identified a contractual provision at issue, explained the defendant's breaching conduct, and alleged damages as a result of the breach) (Fish, Senior J.) Additionally, the court concludes that Southwest's complaint states plausible claims for violations of the CFAA and THACA because Southwest's complaint contains factual allegations that the defendants accessed Southwest's website without authorization in violation of Southwest's use agreement, thereby causing damage to Southwest. See e.g., *Southwest Airlines Co. v. Farechase, Inc.*, 318 F. Supp. 2d 435, 438-49 (N.D. Tex. 2004) (concluding that the plaintiff had stated a plausible CFAA claim, where the plaintiff's complaint made similar allegations that the defendant improperly accessed Southwest's data through an automated scraping device). Furthermore, the court concludes that Southwest's

complaint states plausible claims for unfair competition, trademark infringement, and dilution because Southwest's complaint alleges Southwest's ownership and registration of various marks and explains how the defendants' unauthorized use of Southwest's famous marks on [www.SWMonkey.com](www.SWMonkey.com) tarnished Southwest's trademarks and likely caused consumer confusion.  See, e.g., *Springboards to Education, Inc. v. Kipp Foundation*, 325 F. Supp. 3d 704, 716-718 (N.D. Tex. 2018) (Fish, Senior J.)

Moreover, the defendants have failed to provide the court with any arguments as to how Southwest's pleading are deficient.  *See generally* Memorandum in Support of Defendants' Motion to Dismiss; Reply.  Without any argument as to how Southwest's complaint is flawed or how it fails to state any plausible claim upon which relief can be granted, the court is convinced, for the reasons articulated above, that Southwest's complaint succeeds in stating multiple plausible claims.

Most importantly, however, the court declines the defendants' invitation to consider their contractual estoppel affirmative defense and non-pleading materials. The defendants are correct that if the court, in evaluating the defendants' Rule 12(b)(6) motion, were to consider matters outside of the pleadings, such as the defendants' contractual estoppel argument, Rule 12(d) would require the court to treat their motion to dismiss as a motion for summary judgment.  *See* Federal Rule of Civil Procedure 12(d).  Nevertheless, a district court has "complete discretion to

determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion." *Isquith for and on Behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 193 n.3 (5th Cir.)(citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1366 (1969)), *cert. denied,* 488 U.S. 926 (1988). Here, the court has decided not to exercise its discretion because the court does not believe that doing so and considering the defendants' contractual estoppel affirmative defense will "facilitate the disposition of the action."[7] *Id.* Consequently,

_____

[7] This is because at this stage the court is inclined to agree with Southwest that multiple questions of material fact exist as to the defendants' contractual estoppel argument. Although the court has not and is not deciding these issues, the court is skeptical of the defendants' arguments. For one, the court is troubled by the defendants' claim that Southwest's cease-and-desist letters constituted offers to contract, as the defendants have cited no binding authority, or authority at all for that matter, finding that a cease-and-desist letter similar to those sent by Southwest constituted an offer. In fact, the *Accurso* case relied upon by the defendants does not, in fact, establish that a cease-and-desist letter may constitute an offer to contract. Rather, *Accurso* merely establishes that a letter proposing a settlement may constitute an offer. *Accurso*, 2016 WL 1273878, at *4. *In re H.E.Butt Grocery Co.* similarly fails to establish that a cease-and-desist letter may constitute an offer, as the section of the opinion cited by the defendants only addresses more broadly the issue of unilateral contract formation under Texas law. *In re H.E.Butt Grocery Co.*, 17 S.W.3d at 370. Even assuming that Southwest's letters constituted offers, the court has qualms about the defendants' claim that they created a unilateral contract by removing the functionality from their website and ceasing to access the fare data on Southwest's website. The letters cited by the defendants include demands such as "Your clients . . . need to shut down the website" and "The site needs to come down completely." Memorandum in Support of Defendants' Motion to Dismiss at 17; Reply at 7. Here, it is clear that the defendants did not shut down their website. While the defendants aver that the literal reading of Southwest's demand letters requesting the shutdown of the defendants' website is not the *reasonable* reading of these letters, the defendants provide no explanation as to *why*

(continued...)

for the reasons stated above, the defendants' Rule 12(b)(6) motion to dismiss is denied.

### III.  CONCLUSION

For the reasons outlined above, the court **DENIES** the defendants' motion to dismiss.  Additionally, because the court denies the defendants' motion, the court **DENIES** Southwest's request to dismiss and motion for attorneys' fees as moot.

**SO ORDERED.**

March 22, 2019.

_A. Joe Fish_ _____
**A. JOE FISH**
**Senior United States District Judge**

---

[7](...continued)
this is the case.  *See* Reply at 7-9.  The lack of such an explanation raises concerns to the court.  Finally, the court is dubious about the defendants' claim that its email to Southwest suggesting that Southwest make a nominal payment to the defendants did not constitute a counter-offer.  In sum, because the court has these doubts, the court does not believe that evaluating the defendants' contractual estoppel argument on summary judgment would dispose of this action.